**IN THE UNITED STATES DISTRICT COURT**
**FOR THE NORTHERN DISTRICT OF OKLAHOMA**

| | | |
|---|---|---|
| SANDRA COKER, as Special Administratrix of the Estate of TY RUTLEDGE, deceased, | ) ) ) | |
| Plaintiff, | ) ) | |
| v. | ) ) | Case No. 20-CV-347-GKF-FHM |
| VIC REGALADO, *et al.*, | ) ) ) | |
| Defendants. | ) ) | |

**PLAINTIFF'S RESPONSE IN OPPOSITION TO**
**DEFENDANT TURN KEY'S MOTION TO DISMISS (DKT # 12)**

Robert M. Blakemore, OBA #18656
bobblakemore@ssrok.com
Daniel E. Smolen, OBA # 19943
danielsmolen@ssrock.com
SMOLEN & ROYTMAN
701 S. Cincinnati Ave.
Tulsa, Oklahoma 74119
P: (918) 585-2667
F: (918) 585-2669

*Attorneys for Plaintiffs*

September 18, 2020

# <u>TABLE OF CONTENTS</u>

<u>Page</u>

Table of Authorities..............…..……………….……….……….......................ii

Introduction......................…………………….……….…………………....……..…1

Summary of Allegations......................……………………………………........3

Standard of Review for Motions to Dismiss Involving Municipal Liability Claims…..…..7

Discussion…………………………………………………..……………..……9

**PROPOSITION: PLAINTIFF HAS ALLEGED SUFFICIENT FACTS TO STATE CLAIMS FOR RELIEF THAT ARE "PLAUSIBLE" ON THEIR FACE**…....…......9

    I.      Plaintiff *Has* Alleged Plausible Constitutional Claims Pursuant to 42 U.S.C. § 1983…….................……..…...................................9

          A.    Plaintiff Has Alleged Facts Sufficient to Show That She Suffered a Constitutional Deprivation (*i.e.,* Plaintiff Has Plausibly Alleged Turn Key Personnel Were Deliberately Indifferent to Mr. Rutledge's Serious Medical Needs)........................................……....9

               1.  Plaintiff Has Sufficiently Alleged Deliberate Indifference Under a Purely Objective Standard........................................10

               2.  Even if This Court Should Apply a Traditional Deliberate Indifference Standard, Plaintiff Has Still Alleged Sufficient Facts to State a Plausible Claim………………….......…..15

          B.    Plaintiff's Complaint States Plausible § 1983 Claims Against Turn Key Under a Municipal/*Monell* Liability Theory.........................18

**PROPOSITION: PLAINTIFF FILED HER COMPLAINT WITHIN THE APPLICABLE STATUTE OF LIMITATIONS**...........................................................22

## <u>TABLE OF AUTHORITIES</u>

***CASES***                                              ***Page***

*Allgood v. Elyria United Methodist Home,* 904 F.2d 373, 376 (6th Cir.1990)..........................24

*Ancata v. Prison Health Services,* 769 F.2d 700 (11th Cir. 1985).............................................19

*Archuleta v. Wagner,* 523 F.3d 1278, 1281 (10th Cir. 2008)…………………………….....7

*Barney v. Pulsipher,* 143 F.3d 1299 (10th Cir. 1998)...........................................................21

*Barrie v. Grand County, Utah,* 119 F.3d 862 (10th Cir. 1997)..............................................10

*Bd. of Cnty. Comm'rs of Bryan Cnty., Okl. v. Brown,* 520 U.S. 397 (1997)...............................18

*Bell Atlantic Corp. v. Twombly,* 550 U.S. 544, 570 (2007)..…………………………..…7

*Bell v. Wolfish,* 441 U.S. 520, 545 (1979)………………………………………………10

*Blackmon v. Sutton,* 734 F.3d 1237, 1244 (10th Cir. 2013).....................................................10

*Braxton v. Zavaras,* 614 F.3d 1156, (10th Cir. 2010).......................................................23, 25

*Bruno v. City of Schenectady,* 727 Fed.Appx. 717, 720 (2d Cir. 2018)…………....11, 12

*Bryson v. City of Oklahoma City,* 627 F.3d 784 (10th Cir. 2010)............................................18

*Buckland v. Buckland,* 2011 WL 4809992 (E.D. Okla. 2011).................................................23

*Burke v. Glanz,* 2016 WL 3951364 (N.D. Okla. July 20, 2016).......................................3, 19

*Burke v. Regalado,* 2019 WL 1371144 (N.D. Okla. Mar. 26, 2019).......................................7

*Burke v. Regalado,* 935 F.3d 960, 999-1001 (10th Cir. 2019)................................................19

*Caiozzo v. Koreman,* 581 F.3d 63 (2d Cir. 2009)…………………………………………12

*Castro v. Cnty. of L.A.,* 833 F.3d 1060, 1070–71 (9th Cir. 2016) (en banc), *cert. denied,* –
— U.S. ——, 137 S.Ct. 831, 197 L.Ed.2d 69 (2017)………………………………..……....12

*Colbruno v. Kessler,* 928 F.3d 1155 (10th Cir.
2019)……………………….....................................………………………..……….11, 12

*Cowan v. Davis,* 2020 WL 1503423 (E.D. Cal. Mar. 30, 2020)........................................25

*Cox v. Glanz,* 800 F.3d 1231 (10th Cir. 2015).....................................................................10

*Currie v. Chhabra,* 728 F.3d 626 (7th Cir. 2013) )..............................................................13

*Dean Witter Reynolds, Inc. v. Hartman,* 911 P.2d 1094 (Colo.1996).......................................25

*D.G. by & Through Bradley v. Westville Pub. Sch. Dist. No. I-11 of Adair Cty.,* 2018 WL 4323917, at \*2 (E.D. Okla., Sept. 10, 2018)........................................................................8

*Darnell v. Pineiro,* 849 F.3d 17, 34–35 (2nd Cir. 2017)………………………………..11, 12

*DeSpain v. Uphoff,* 264 F.3d 965, 975 (10th Cir. 2001)………………………………....16

*Dubbs v. Head Start, Inc.,* 336 F.3d 1194 (10th Cir. 2003).............................................18, 19

*Duff v. Potter,* 665 F. App'x 242 (4th Cir. 2016)..................................................................13

*Estate of Blodgett v. Correct Care Solutions, LLC,* 2018 WL 6528109  (D.Colo.2018)..............21

*Estelle v. Gamble,* 429 U.S> 97, 104, 97 S.Ct. 285, 50 L.Ed.2d 251 (1976)………....…..10

*Evans v. Newton,* 382 U.S. 296 (1966)....................................................................................18

*Farmer v. Brennan,* 511 U.S. 825, 842 (1994)………………………..…………….16, 21

*Fratus v. DeLand,* 49 F.3d 673, 675 (10th Cir.1995)..........................................................23

*Garcia v. Salt Lake County,* 768 F.3d 303 (10th Cir. 1985).....................................................17

*Gooding v. Ketcher,* 838 F. Supp. 2d 1231, 1241 (N.D. Okla. 2012)....................................8, 9

*Gordon v. Cnty. of Orange,* 888 F.3d 1118, 1125 (9th Cir. 2018)………......…11, 12, 13, 14

*Jojola v. Chavez,* 55 F.3d 488, 494 (10th Cir. 1995)………………………………….....7

*Kingsley v. Hendrickson,* ⸺ U.S. ⸺, 135 S.Ct. 2466, 2473 (2015)..…………*passum*

*Lopez v. LeMaster,* 172 F.3d 756, 759 (10th Cir.1999)…………………..……………….9

*Leatherman v. Tarrant Cnty. Narcotics Intelligence & Coordination Unit,* 507 U.S. 163 (1993).......8

*Martinez v. Beggs,* 563 F.3d 1082, 1088-91 (10th Cir. 2009)………………..…………15

*Martin v. Bd. of County Com'rs of County of Pueblo,* 909 F.2d 402 (10th Cir. 1990)..................10

*Manuel v. City of Joliet,* ⸺ U.S. ⸺, 137 S.Ct. 911, 197 L.Ed.2d 312 (2017)................13

*Mata v. Saiz,* 427 F.3d 745, 755 (10th Cir. 2005)…....…………………….….15, 16, 17

*Maury v. Davis,* No. 2:12-CV-1043 WBS DB, 2020 WL 3065934, at *2 (E.D. Cal. Apr. 21, 2020), *report and recommendation adopted*, No. 212CV1043WBSDBP, 2020 WL 3057818 (E.D. Cal. June 9, 2020)..................................................................................................25

*McCarty v. Gilchrist*, 646 F.3d 1281, 1289 (C.A.10 (Okla.) 2011)........................................23

*Merriweather v. City of Memphis*, 107 F.3d 396, 398 (6th Cir. 1997)......................................24

*Monell v. New York City Dept. of Social Servs.,* 436 U.S. 658 (1977)..........................................18

*Miranda v. Cty. of Lake,* 900 F.3d 335, 352 (7th Cir. 2018)……………………11, 12, 13

*Moya v. Schollenbarger,* 465 F.3d 444 at 455 (10th Cir. 2006)…………………………7

*Olsen v. Layton Hills Mall,* 312 F.3d 1304, 1315 (10th Cir. 2002)..…………………9, 10

*Pace v. DiGuglielmo*, 544 U.S. 408, 418, 125 S. Ct. 1807, 161 L. Ed. 2d 669 (2005)...........25

*Pena v. Dallas Cnty. Hosp. Dist.*, 2013 WL 11299229 (N.D. Tex. June 26, 2013).................8

*Perry v. Durborow,* 892 F.3d 1116, 1122, n. 1 (10th Cir. 2018)….….……………………11

*Richmond v. Huq*, 885 F.3d 928, 938 (6th Cir. 2018)......................................................11, 12

*Rife v. Oklahoma Dep't of Pub. Safety,* 854 F.3d 637, 647 (10th Cir.), *cert. denied sub nom. Dale v. Rife*, 138 S. Ct. 364, 199 L. Ed. 2d 273 (2017)…………..……16

SCAD NO. 2020-24, First Emergency Joint Order Regarding The COVID-19 State of Disaster..............................................................................................................23

SCAD NO. 2020-29, Second Emergency Joint Order Regarding The COVID-19 State of Disaster..............................................................................................................23

SCAD NO. 2020-36, Third Emergency Joint Order Regarding The COVID-19 State of Disaster..............................................................................................................24

*Schaefer v. Whitted,* 121 F. Supp. 3d 701, 718 (W.D. Tex. 2015)..........................................8

*Sealock v. Colorado,* 218 F.3d 1205, 1211 (10th Cir. 2000).....………………...10, 16, 17

*Tafoya v. Salazar,* 516 F.3d 912, 916 (10th Cir. 2008)…...……………………………...16

iv

*Taylor v. RED Dev., LLC,* 2011 WL 3880881 (D. Kan. Aug. 31, 2011)................................8

*Thomas v. City of Galveston,* 800 F. Supp. 2d 826 (S.D. Tex. 2011)....................................7, 9

*United States v. Clymore,* 245 F.3d 1195, 1199 (10th Cir.2001)............................................25

*Wallace v. Kato,* 549 U.S. 384, 387, 127 S.Ct. 1091, 166 L.Ed.2d 973 (2007)...................23

*West v. Atkins,* 487 U.S. 42 (1988)........................................................................................19

**COMES NOW**, Sandra Coker ("Plaintiff"), as the Special Administratrix of the Estate of Ty Rutledge ("Mr. Rutledge" or "Ty"), deceased, and respectfully submits her Response in Opposition to Defendant Turn Key Health Clinics, LLC's ("Turn Key") Motion to Dismiss Complaint (Dkt. #12), as follows:

## Introduction

On July 20, 2020, Plaintiff filed her Complaint (Dkt. #2), setting forth detailed and thorough allegations in support of the Constitutional claims against Defendants Vic Regalado, in his official capacity as Sheriff of Tulsa County ("Sheriff Regalado"), Tulsa County Sheriff's Office ("TCSO") Corporal Olakule Babarinde ("Cpl. Babarinde"), TCSO Officer Brandon Blish ("Officer Blish") and Turn Key Health Clinics, LLC ("Turn Key").

More specifically, as alleged, Ty Rutledge ("Mr. Rutledge") entered the Tulsa County Jail ("Jail") on January 15, 2018. Shortly after arriving at the Jail, Mr. Rutledge was threatened by other inmates and placed in Jail's Segregated Housing Unit, or "SHU." On at least one occasion, Mr. Rutledge was violently assaulted by other inmates. Mr. Rutledge, who had a history of depression, was known to be, and was obviously, depressed and suicidal at various times while housed in the SHU. Due to Mr. Rutledge's history and obvious signs of depression suicidal insinuations, he should have been placed on suicide watch precautions, including constant video monitoring, removal of bed sheets and garments from his room, frequent visual wellness checks and monitoring by intercom system. Tragically, however, TCSO staff – including Cpl. Babarinde and Officer Blish – and Turn Key staff failed to provide any mental health assessment or treatment, failed to place Mr. Rutledge on suicide watch precautions, and failed to properly monitor him. On May 19, 2018 at approximately 3:30 p.m., Officer Blish and Cpl. Babarinde discovered Mr. Rutledge in his cell.  He was unresponsive and face down with blood on the floor. Mr. Rutledge

purportedly had a towel or shirt tied around his neck.  Cpl. Babarinde purportedly removed the towel or shirt from around Mr. Rutledge's neck and blood came out of his mouth. In addition to abrasions on his neck, Mr. Rutledge also had injuries to his scalp, arm and legs. In violation of policy, neither Officer Blish nor Cpl. Babarinde attempted CPR.

Moreover, medical staff employed by Turn Key failed to provide mental health care and supervision – including suicide watch precautions – for Ty Rutledge in spite of the obvious and substantial risk that Rutledge posed to himself. The staff in the SHU, including Cpl. Babarinde and Officer Blish, and responsible Turn Key staff, were deliberately indifferent to the known or obvious risks of suicide/self-harm and/or violent assault[1] to Mr. Rutledge by failing to take adequate measures to protect Mr. Rutledge from the known or obvious risks of serious harm. That deliberate indifference to Mr. Rutledge's health and safety, as described herein, was a proximate cause of his physical and mental pain and suffering, a worsening of his condition, and his death.

Turn Key fostered a company-wide and longstanding practice of dangerously substandard, and mostly nonexistent, medical care. And despite the fact that this practice had resulted in "deaths or negative medical outcomes in numerous cases, in addition to Mr. Rutledge's[,]" Turn Key failed to take reasonable steps to alleviate those risks, in deliberate indifference to inmates', including Mr. Rutledge's, serious medical needs." *See* Dkt. #2, ¶¶ 57-75. Yet, Turn Key did nothing to alleviate the obvious risks its policies posed to inmates' health and safety. *Id.* Further, as shown, Turn Key's culture/policy of prioritizing profits over the health and safety of its patients has manifested in a number of unconstitutional practices, each of which deprives inmates at the Jail from receiving adequate medical care. *Id.* at ¶¶ 47-75.

---

[1]    Allegedly, there was a note found in Mr. Rutledge's cell which contained purported "suicidal insinuations".  Nevertheless, TCSO has refused to provide this note to the undersigned despite multiple requests.  TCSO's refusal to provide the note, and other requested documents, prior to this lawsuit being filed highlights Plaintiff's need for discovery in this matter.

Additionally, Mr. Rutledge's suffering, death and violations of his constitutional rights resulted from official policies, customs and/or practices which Sheriff Regalado/TCSO had responsibility for creating, maintaining and implementing. *See, e.g.,* Complaint, ¶¶ 26-52, 58, 60, 70-75. Turn Key and TCSO merely continued the unconstitutionally deficient health care delivery system previously maintained by Correctional Healthcare Companies, Inc. ("CHC") and Armor Correctional Health Services, Inc. ("Armor"). *See, e.g.,* Complaint, ¶¶ 26-46.  *See also Burke v. Glanz,* No. 11-CV-720-JED-PJC, 2016 WL 3951364, at *23 (N.D. Okla. July 20, 2016) ("[B]ased on the record evidence construed in plaintiff's favor, a reasonable jury could find that … then-Sheriff Glanz was responsible for knowingly continuing the operation of a policy or established practice of providing constitutionally deficient medical care….").

Defendant's Motion should be ***denied***.

<u>**Summary of Allegations**</u>

In order to assist the Court with its analysis of Turn Key's Motion to Dismiss, Plaintiff provides the following summary of allegations concerning Mr. Rutledge and the requisite Turn Key policies, practices, and/or customs that are causally linked to its employees' deliberately indifferent acts and/or omissions as they pertain to Mr. Rutledge. To wit, Plaintiff has alleged, *inter alia*:

- "Mr. Rutledge was booked into the Tulsa County Jail ("the Jail") on around January 15, 2018."

- "On information and belief, early on, Mr. Rutledge was threatened by other inmates and placed in the Jail's Segregated Housing Unit, or 'SHU'."

- "On information and belief, on at least one occasion, Mr. Rutledge was violently assaulted by other inmates."

- "On information and belief, Mr. Rutledge was at known to be, and was obviously, depressed and suicidal at various times while housed in the SHU."

- ■ "On information and belief, on more than one occasion, Mr. Rutledge should have been placed on suicide watch precautions, including constant video monitoring, removal of bed sheets and garments from his room, frequent visual wellness checks and monitoring by intercom system."

- ■ "On May 19, 2018, Mr. Rutledge was being housed in the SHU."

- ■ "On information and belief, it was known or obvious to the TCSO staff in the SHU, including [Defendant] Cpl. Babarinde and [Defendant] Officer Blish, that Mr. Rutledge posed an excessive risk of suicide/self-harm and/or violent assault by other inmates."

- ■ "At approximately 3:30pm on May 19, Officer Blish and Cpl. Babarinde discovered Mr. Rutledge in his cell.  He was unresponsive and face down with blood on the floor. Mr. Rutledge purportedly had a towel or shirt tied around his neck.  Cpl. Babarinde purportedly removed the towel or shirt from around Mr. Rutledge's neck and blood came out of his mouth. In addition to abrasions on his neck, Mr. Rutledge also had injuries to his scalp, arm and legs. In violation of policy, neither Officer Blish nor Cpl. Babarinde attempted CPR."

- ■ "In addition, on information and belief, medical staff employed by Turn Key failed to provide mental health care and supervision – including suicide watch precautions – for Ty Rutledge in spite of the obvious and substantial risk that Rutledge posed to himself."

- ■ "On information and belief, Turn Key staff's failures in this regard constitute deliberate indifference to serious medical need."

- ■ "After medical staff arrived, Mr. Rutledge was pronounced dead."

- ■ "On information and belief, the staff in the SHU, including Cpl. Babarinde and Officer Blish, and responsible Turn Key staff, were deliberately indifferent to the known or obvious risks of suicide/self-harm and/or violent assault[2] to Mr. Rutledge by failing to take adequate measures to protect Mr. Rutledge from the known or obvious risks of serious harm."
- ■ "In particular, on information and belief, the staff in the SHU, including Cpl. Babarinde and Officer Blish, and responsible Turn Key staff, failed to, *inter alia*: refer Mr. Rutledge for a mental health assessment, frequently visually monitor Mr. Rutledge; place Mr. Rutledge on suicide watch precautions, remove bed linens and garments from Mr. Rutledge's cell; monitor Mr. Rutledge through use of the intercom system; call medical personnel to provide treatment to Mr. Rutledge."

---

[2]   Allegedly, there was a note found in Mr. Rutledge's cell which contained purported "suicidal insinuations".  Nevertheless, TCSO has refused to provide this note to the undersigned despite multiple requests.  TCSO's refusal to provide the note, and other requested documents, prior to this lawsuit being filed highlights Plaintiff's need for discovery in this matter.

■ "The deliberate indifference to Mr. Rutledge's serious medical needs, his mental health and his safety, as summarized *supra*, was in furtherance of and consistent with: (a) policies, customs, and/or practices which TCSO promulgated, created, implemented or possessed responsibility for the continued operation of; and (b) policies, customs, and/or practices which Turn Key promulgated, created, implemented or possessed responsibility for the continued operation of."

■ "There are longstanding, systemic deficiencies in the mental health care, including the failure to protect inmates from self-harm, provided to inmates at the Tulsa County Jail. Both Sheriff Regalado and Former Sheriff Stanley Glanz have long known of these systemic deficiencies and the substantial risks they pose to inmates like Mr. Rutledge but failed to take reasonable steps to alleviate those deficiencies and risks."

■ "In 2016, the County/Sheriff Regalado retained Turn Key as the Jail's medical contractor. Turn Key's CEO, Flint Junod, was Armor's Vice President of the Jail's region during Armor's tenure as the Jail's private medical provider and he was aware of deficiencies in the medical care provided at the Jail prior to and at the time Turn Key was retained."

■ "For a time in recent years, Defendant Turn Key was the largest private medical care provider to county jails in the state.  Turn Key used its political connections to obtain contracts in a number of counties, including Tulsa County, Muskogee County, Garfield County and Creek County."

■ "To achieve net profits, Turn Key implemented policies, procedures, customs, or practices to reduce the cost of providing medical and mental health care service in a manner that would maintain or increase its profit margin."

■ "There are no provisions in Turn Key's contract creating or establishing any mandatory minimum expenditure for the provision of Healthcare Services. Turn Key's contract incentivizes cost-cutting measures in the delivery of medical and mental health care service at the Jail to benefit Turn Key's investors in a manner that deprives inmates at the Jail from receiving adequate medical care."

■ "Under the Contract, Turn Key is responsible to pay the costs of all pharmaceuticals at the Jail.  And TCSO/Tulsa County is responsible for the costs of all inmate hospitalizations and off-site medical care.   These contractual provisions create a dual financial incentive to under-prescribe and under-administer medications and to keep inmates, even inmates with serious medical needs, at the Jail to avoid off-site medical costs."

■ "These financial incentives create risks to the health and safety of inmates like Mr. Rutledge who have complex and serious medical needs, such as opioid withdrawal, seizure disorders, mental health issues, and heart disease."

- "Turn Key has no protocol or clear policy with respect to the medical monitoring and care of inmates with complex or serious medical needs, and provides no guidance to its medical staff regarding the appropriate standards of care with respect to inmates with complex or serious mental health needs, including suicidal inmates."

- "Specifically, Turn Key has an established practice of failing to adequately assess and treat -- and ignoring and disregarding -- obvious or known symptoms of emergent and life-threatening conditions."

- "These failures stem from the chronic unavailability of an on-site physician, financial incentives to avoid the costs of inmate prescription medications and off-site treatment and a failure to train and supervise medical staff in the assessment and care of inmates with complex or serious mental health needs, including suicidal inmates."

- "Turn Key's inadequate or non-existent policies and customs were a moving force behind the constitutional violations and injuries alleged herein."

- "For instance, on May 10, 2016, an inmate housed in the SHU attempted suicide by tying the lower hem of his t-shirt to his neck and bed. Detention Officer Baker was the first to enter the cell and was able to remove the t-shirt from the inmate's neck and laid him on the floor. Once was laid down, he awoke and responded to verbal commands but appeared to be sluggish. The inmate was then transported to medical for further evaluation and observation."

- "In June 2016, a nurse who worked for Turn Key at the Garfield County Jail allegedly did nothing to intervene while a hallucinating man was kept in a restraint chair for more than 48 hours. That man, Anthony Huff, ultimately died restrained in the chair."

- "On July 9, 2016, an inmate was booked into the Jail and placed on suicide watch after telling Jail staff he was suicidal. He was placed in a medical unit where he could be monitored by staff. Despite being on suicide watch, this inmate was, upon information and belief, not adequately monitored or supervised by Jail staff, and was able to obtain a material that he used to lacerate veins in his wrists in an apparent suicide attempt. The inmate was found unconscious and bleeding profusely, and was subsequently transferred to the hospital."

- "Turn Key has maintained a custom of inadequate medical care and staffing at a corporate level which poses excessive risks to the health and safety of inmates like Mr. Rutledge."

- "On information and belief, the violation of Mr. Rutledge's Constitutional rights was a highly predictable consequence of TCSO and/or Turn Key's failure to train and/or supervise staff with respect to the care, assessment, monitoring and

precautions necessary to address the recurring situation of inmates who pose a substantial risk of self-harm or harm from other inmates."

Complaint (Dkt. #2) at ¶¶ 10-26; 47-60; 71; 73.

## **Standard of Review for Motions to Dismiss Involving Municipal Liability Claims**

When deciding a Rule 12(b) motion to dismiss, courts are "'limited to assessing the legal sufficiency of the allegations contained within the four corners of the complaint ....'" *Archuleta v. Wagner,* 523 F.3d 1278, 1281 (10th Cir. 2008) (quoting *Jojola v. Chavez,* 55 F.3d 488, 494 (10th Cir. 1995)). In conducting this assessment, courts must "'accept as true all well-pleaded facts, as distinguished from conclusory allegations, and view those facts in the light most favorable to the nonmoving party.'" *Archuleta,* 523 F.3d at 1283 (quoting *Moya v. Schollenbarger,* 465 F.3d 444 at 455 (10th Cir. 2006)).

In *Bell Atlantic Corp. v. Twombly,* 550 U.S. 544, 570 (2007), the United States Supreme Court held that the complaint must contain "enough facts to state a claim to relief that is *plausible* on its face" (emphasis added). "The plausibility requirement 'does not impose a probability requirement at the pleading stage; it simply calls for enough fact to raise a reasonable expectation that discovery will reveal evidence' of the conduct necessary to make out the claim." *Burke v. Regalado,* No. 18-CV-231-GKF-FHM, 2019 WL 1371144, at *2 (N.D. Okla. Mar. 26, 2019) (*quoting Twombly,* 550 U.S. at 556).

It is significant that Plaintiff's claims against Turn Key are based on a municipal liability theory. Even after *Twombly* and *Iqbal,* courts have applied a laxed standard when reviewing municipal liability claims at the motion to dismiss stage. In *Thomas v. City of Galveston,* 800 F. Supp. 2d 826, 841-45 (S.D. Tex. 2011), the court articulated a method to reconcile the *Iqbal-Twombly* standard with the Supreme Court's prior rejection of a heightened pleading standard for § 1983

claims against municipalities set out in *Leatherman v. Tarrant Cnty. Narcotics Intelligence & Coordination Unit*, 507 U.S. 163 (1993).

Accepting that *Iqbal* instructs courts to utilize judicial experience and common sense when determining whether a complaint states a plausible claim for relief and further recognizing that in the municipal liability context, the *Thomas* Court observed that "it is exceedingly rare that a plaintiff will have access to (or personal knowledge of) specific details regarding the existence or absence of internal policies or training procedures prior to discovery,"[3] and concluded that ***"only minimal factual allegations should be required at the motion to dismiss stage."*** *Thomas*, 800 F. Supp. 2d at 842-43 (emphasis added). The *Thomas* decision struck the appropriate balance of "requiring more than boilerplate allegations but not demanding specific facts that prove the existence of a policy." *Id.* at 844.

Other courts, including the Northern and Eastern Districts of Oklahoma, have followed this commonsense approach to the factual specificity required for municipal liability claims. *See, e.g., Gooding v. Ketcher*, 838 F. Supp. 2d 1231, 1241 (N.D. Okla. 2012); *D.G. by & Through Bradley v. Westville Pub. Sch. Dist. No. I-11 of Adair Cty.*, No. CV-18-045-RAW, 2018 WL 4323917, at *2 (E.D. Okla., Sept. 10, 2018); *Schaefer v. Whitted*, 121 F. Supp. 3d 701, 718 (W.D. Tex. 2015); *Pena v. Dallas Cnty. Hosp. Dist.*, No. 3:12-CV-439-N, 2013 WL 11299229, at *10 n.16 (N.D. Tex. June 26, 2013); *Taylor v. RED Dev., LLC*, No. 11-2178-JWL, 2011 WL 3880881, at *3 (D. Kan. Aug. 31, 2011); *E.G. by Gonzalez v. Bond*, No. 1:16-CV-0068-BL, 2016 WL 8672774, at *5–6 (N.D. Tex. Sept. 9, 2016), *report and recommendation adopted as modified sub nom. E.G. v. Bond*, No. 1:16-CV-068-C, 2017 WL 129019 (N.D. Tex. Jan. 13, 2017). In *Gooding*, this Court "agree[d] with the approach … taken in *Taylor v. RED Development, LLC*, No. 11–2178–JWL, 2011 WL 3880881 (D.Kan. Aug. 31, 2011),

---

[3]        This is particularly true where, as here, the case involves a death claim.

wherein the court required more than 'boilerplate allegations' of a municipal policy, but ***did not 'deman[d] specific facts that prove the existence of a policy' when a plaintiff would not have access to such information before discovery.***" *Gooding*, 838 F. Supp. 2d at 1241 (also citing *Thomas*, 800 F.Supp.2d at 842–43) (emphasis added).

Applying this standard of review, the allegations against Turn Key contained in the Complaint meet the "plausibility" standard.

## Discussion

## PROPOSITION:   PLAINTIFF HAS ALLEGED SUFFICIENT FACTS TO STATE CLAIMS FOR RELIEF THAT ARE "PLAUSIBLE" ON THEIR FACE

I.   **Plaintiff Has Alleged Plausible Constitutional Claims Pursuant to 42 U.S.C. § 1983**

   A.   **Plaintiff *Has* Alleged Facts Sufficient to Show That She Suffered a Constitutional Deprivation (*i.e.,* Plaintiff Has Plausibly Alleged Turn Key Personnel Were Deliberately Indifferent to Mr. Rutledge's Serious Medical Needs)**

As noted above, Plaintiff's federal claims against Turn Key are brought pursuant to a municipal liability theory. Typically, courts will not hold a municipality liable without proof of an "underlying constitutional violation by [one] of its officers." *Olsen v. Layton Hills Mall*, 312 F.3d 1304, 1317–18 (10th Cir. 2002). Contrary to Turn Key's position, there are ample and plausible allegations that multiple Turn Key employees violated Mr. Rutledge's Constitutional right to medical care.

Although "neither prison officials nor municipalities can absolutely guarantee the safety of their prisoners, [t]hey are ... responsible for taking reasonable measures to [e]nsure the safety of inmates." *Lopez v. LeMaster*, 172 F.3d 756, 759 (10th Cir.1999) (internal citation omitted).  The Tenth Circuit has stated that a pretrial detainee's Fourteenth Amendment deliberate indifference claim of inadequate medical care should be evaluated pursuant to the standards set by the United

States Supreme Court in *Estelle v. Gamble*, 429 U.S. 97 (1976), which concerned a convicted prisoner's Eighth Amendment deliberate indifference claim. *See Blackmon v. Sutton*, 734 F.3d 1237, 1244 (10th Cir. 2013). In other words, pretrial detainees, like Mr. Rutledge, who have not been convicted of a crime, have a constitutional right to medical and psychiatric care under the Due Process Clause of the Fourteenth Amendment ***"at least*** [to] the same standard of care prison officials owe convicted inmates." *Blackmon*, 734 F.3d at 1244 (emphasis added). *See also Bell v. Wolfish*, 441 U.S. 520, 545 (1979); *Martin v. Bd. of County Com'rs of County of Pueblo*, 909 F.2d 402, 406 (10th Cir. 1990).

### 1. Plaintiff Has Sufficiently Alleged Deliberate Indifference Under a Purely Objective Standard

Claims arising from a failure to prevent inmate suicide "are considered and treated as claims based on the failure of jail officials to provide medical care for those in their custody." *Barrie v. Grand County, Utah*, 119 F.3d 862, 866 (10th Cir. 1997). Thus, a plaintiff bringing such a claim must prove that a jail employee/agent was "deliberately indifferent to a substantial risk of suicide." *Barrie v. Grand County, Utah*, 119 F.3d at 869 (internal quotation marks omitted). *See also Cox v. Glanz*, 800 F.3d 1231, 1247-48 (10th Cir. 2015).

Under the traditional analysis, "[d]eliberate indifference involves both an objective and subjective component." *Olsen v. Layton Hills Mall*, 312 F.3d 1304, 1315 (10th Cir. 2002) (quoting *Sealock v. Colorado*, 218 F.3d 1205, 1209 (10th Cir. 2000)) (internal quotation marks omitted). However, ***more recent caselaw indicates that the Fourteenth Amendment rights of pretrial detainees, like Mr. Rutledge, should be analyzed under a <u>purely</u> <u>objective</u> standard.*** *See, e.g., Kingsley v. Hendrickson*, —— U.S. ——, 135 S.Ct. 2466, 2473 (2015) (held that a pretrial detainee's Fourteenth Amendment excessive force claim need only meet the objective component by showing that "the force purposely or knowingly used against him was objectively

unreasonable."). And several federal circuit courts have applied *Kingsley*'s **objective standard in medical-care claims** brought by pretrial detainees under the Fourteenth Amendment. *See, e.g., Gordon v. Cnty. of Orange*, 888 F.3d 1118, 1125 (9th Cir. 2018) (extending *Kingsley* to medical care claims brought by pretrial detainees under the Fourteenth Amendment); *Miranda v. Cty. of Lake*, 900 F.3d 335, 352 (7th Cir. 2018) ("We … conclude, along with the Ninth and Second Circuits, that medical-care claims brought by pretrial detainees under the Fourteenth Amendment are subject only to the objective unreasonableness inquiry identified in *Kingsley*."); *Darnell v. Pineiro*, 849 F.3d 17, 34–35 (2nd Cir. 2017) (applying the objective standard to detainees' Fourteenth-Amendment complaints about their conditions of confinement; in the process it overruled a decision applying a subjective test to a medical-care claim); *Bruno v. City of Schenectady*, 727 Fed.Appx. 717, 720 (2d Cir. 2018) (unpublished) (in a medical care case, asking "whether a 'reasonable person' would appreciate the risk to which the detainee was subjected"). *See also Richmond v. Huq*, 885 F.3d 928, 938 (6th Cir. 2018) (relying on *Kingsley* for the observation that "this shift in Fourteenth Amendment deliberate indifference jurisprudence calls into serious doubt whether Richmond need even show that the individual defendant-officials were subjectively aware of her serious medical conditions and nonetheless wantonly disregarded them.").

Importantly, the Tenth Circuit has now weighed in on this rapidly evolving area of the law. *See Colbruno v. Kessler*, 928 F.3d 1155, 1161-65 (10th Cir. 2019). Prior to July 2, 2019, the Tenth Circuit has not applied *Kingsley* in contexts outside of an excessive force claim. *But see Perry v. Durborow*, 892 F.3d 1116, 1122, n. 1 (10th Cir. 2018) (strongly suggesting in *dicta*, that *Kingsley* applies in 14th Amendment conditions of confinement cases). On July 2, however, the Circuit issued its opinion in *Colbruno v. Kessler*. The *Colbruno* case does not involve an excessive force claim, but rather, a claim that sheriff's deputies violated the plaintiff's Fourteenth Amendment rights when they marched him into and through a public hospital while he was completely naked, save a

pair of mittens.   Citing *Kingsley,* the *Colbruno* Court reasoned that "a **pretrial detainee can establish a due-process violation by 'providing only objective evidence** that the challenged governmental action is not rationally related to a legitimate governmental objective or that it is excessive in relation to that purpose.'" *Colbruno,* 928 F.3d at 1163 (quoting *Kingsley,*135 S.Ct. at 2473-74) (emphasis added).   The Court ultimately held that the deputies' exposure of the plaintiff's body violated the Fourteenth Amendment as such conduct was not "'rationally related to a legitimate governmental objective or [was] excessive in relation to that purpose.'" *Id.*

The *Colbruno* decision is a landmark.  In light of *Colbruno,* it can no longer be argued that *Kingsley*'s scope is limited to excessive force case. Rather, as recognized by *Colbruno, Kingsley's* objective standard of liability applies, generally, to Fourteenth Amendment cases concerning the rights of pretrial detainees. More to the point, under *Colbruno,* the *Kingsley* standard should be applied in **this** case involving "medical-need" claims of a pretrial detainee.

As the Seventh Circuit held and persuasively reasoned in *Miranda:*

Though *Kingsley*'s direct holding spoke only of excessive-force claims, two of our sister circuits have held that its logic is not so constrained. The Ninth Circuit first extended *Kingsley*'s objective inquiry to detainees' Fourteenth-Amendment failure-to-protect claims. *Castro v. Cnty. of L.A.,* 833 F.3d 1060, 1070–71 (9th Cir. 2016) (en banc), *cert. denied,* —— U.S. ——, 137 S.Ct. 831, 197 L.Ed.2d 69 (2017). Since then, that court has applied the *Kingsley* holding more broadly to a medical-need claim brought by a pretrial detainee. *Gordon v. Cnty. of Orange,* 888 F.3d 1118, 1120, 1122–25 (9th Cir. 2018). The Second Circuit followed suit, applying the objective standard to detainees' Fourteenth-Amendment complaints about their conditions of confinement; in the process it overruled a decision applying a subjective test to a medical-care claim. *Darnell v. Pineiro,* 849 F.3d 17, 34–35 (2d Cir. 2017) (overruling *Caiozzo v. Koreman,* 581 F.3d 63 (2d Cir. 2009) ).… Later, the Second Circuit expressly applied an objective standard to a claim of deliberate indifference to a serious medical condition. *Bruno v. City of Schenectady,* 727 Fed.Appx. 717, 720 (2d Cir. 2018) (unpublished) (asking "whether a 'reasonable person' would appreciate the risk to which the detainee was subjected"). Other courts of appeals have contemplated the same reading of *Kingsley. Richmond v. Huq,* 885 F.3d 928, 938 n.3 (6th Cir. 2018).…

The Eighth, Eleventh, and Fifth Circuits have chosen to confine *Kingsley* to its facts—that is, to Fourteenth-Amendment claims based on excessive-force allegations in a pretrial setting [citations omitted].

\*\*\*

Some circuits have continued to analyze inadequate medical treatment claims under the deliberate indifference standard without grappling with the potential implications of *Kingsley*. *E.g.*, *Duff v. Potter*, 665 F. App'x 242, 244–45 (4th Cir. 2016) (applying the objective reasonableness standard to a detainee's excessive-force claim but not his medical-need claim, which it affirmed on forfeiture grounds).

We have not yet expressly weighed in on the debate. … Because the answer may make a difference in the retrial of Gomes's claims, we think it appropriate to address the proper standard at this time. We begin with the fact that the Supreme Court has been signaling that courts must pay careful attention to the different status of pretrial detainees. In this respect, *Kingsley* does not stand alone. *See, e.g.*, *Manuel v. City of Joliet*, —— U.S. ——, 137 S.Ct. 911, 197 L.Ed.2d 312 (2017) (allowing Fourth Amendment challenges to pretrial detention even beyond the start of legal process). The Court has cautioned that the Eighth Amendment and Due Process analyses are not coextensive. *See Kingsley*, 135 S.Ct. at 2475 ("The language of the two Clauses differs, and the nature of the claims often differs."); *Currie v. Chhabra*, 728 F.3d 626, 630 (7th Cir. 2013) ("[D]ifferent constitutional provisions, and thus different standards, govern depending on the relationship between the state and the person in the state's custody."). We see nothing in the logic the Supreme Court used in *Kingsley* that would support this kind of dissection of the different types of claims that arise under the Fourteenth Amendment's Due Process Clause. To the contrary, the Court said that ***"[t]he language of the [Eighth and Fourteenth Amendments] differs, and the nature of the claims often differs. And, most importantly, pretrial detainees (unlike convicted prisoners) cannot be punished at all, much less 'maliciously and sadistically.'"*** 135 S.Ct. at 2475 (citations omitted). ***We thus conclude, along with the Ninth and Second Circuits, that medical-care claims brought by pretrial detainees under the Fourteenth Amendment are subject only to the objective unreasonableness inquiry identified in Kingsley.***

*Miranda*, 900 F.3d at 351–52 (emphasis added). Conditions of confinement actions, including right to adequate medical care claims, brought by pretrial detainees, "***must*** be evaluated under an objective deliberate indifference standard." *Gordon*, 888 F.3d at 1125 (emphasis added).

Applying a purely objective standard of liability, the facts alleged in the Complaint, as summarized above, plausibly state that responsible Turn Key staff "did not take reasonable available measures to abate [the] risk [of substantial harm to Mr. Rutledge], even though a

reasonable official in the circumstances would have appreciated the high degree of risk involved—

making the consequences of the … conduct obvious…." *Gordon*, 888 F.3d at 1125.  Pertinent to

Turn Key staff, Plaintiff alleges:

- Mr. Rutledge was threatened by other inmates and placed in the Jail's Segregated Housing Unit, or "SHU."

- On at least one occasion, Mr. Rutledge was violently assaulted by other inmates.

- Mr. Rutledge was at known to be, and was obviously, depressed and suicidal at various times while housed in the SHU.

- Mr. Rutledge should have been placed on suicide watch precautions, including constant video monitoring, removal of bed sheets and garments from his room, frequent visual wellness checks and monitoring by intercom system.

- On May 19, 2018, Mr. Rutledge was being housed in the SHU.

- At approximately 3:30pm on May 19, Officer Blish and Cpl. Babarinde discovered Mr. Rutledge in his cell.  He was unresponsive and face down with blood on the floor. Mr. Rutledge purportedly had a towel or shirt tied around his neck.

- Medical staff employed by Turn Key failed to provide mental health care and supervision – including suicide watch precautions – for Ty Rutledge in spite of the obvious and substantial risk that Rutledge posed to himself.

- The Medical Examiner later found that the cause of death was "asphyxia due to ligature strangulation."  The Medical Examiner further determined that the circumstances under which the body was found "are most consistent with suicide."

- Responsible Turn Key staff, failed to, *inter alia*: refer Mr. Rutledge for a mental health assessment, frequently visually monitor Mr. Rutledge; place Mr. Rutledge on suicide watch precautions, remove bed linens and garments from Mr. Rutledge's cell; monitor Mr. Rutledge through use of the intercom system; call medical personnel to provide treatment to Mr. Rutledge.

*See* Dkt. #2 at ¶¶ 11-15; 17-18; 21; 23.

Applying a purely objective standard of liability, the facts alleged in the Complaint, as

summarized above, state that Turn Key Staff failed to take reasonable available measures to abate

substantial risks to Mr. Rutledge's health and safety, even though reasonable health care

professionals in the circumstances would have appreciated the high degree of risk involved—

making the consequences of the Turn Key personnel's conduct obvious. Any reasonable medical professional would recognize that an inmate who had: 1) been threatened and assaulted by other inmates; 2) was placed in isolation; and 3) was known to be obviously depressed and suicidal was at risk for great harm and required a mental health evaluation and treatment by a qualified medical professional, constant video monitoring, and the removal of bed linens and garments from his cell. However, on information and belief, Turn Key personnel did absolutely nothing to assist Mr. Rutledge, in deliberate indifference to his obvious serious medical needs. Plaintiff has aptly alleged a violation of Mr. Rutledge's Fourteenth Amendment rights under a solely objective standard.

## 2. Even if This Court Should Apply a Traditional Deliberate Indifference Standard, Plaintiff Has Still Alleged Sufficient Facts to State a Plausible Claim

To be clear, it is Plaintiff's position that the subjective component of the traditional deliberate indifference standard no longer applies to cases brought by pretrial detainees under the Fourteenth Amendment. However, even if this Court should apply the traditional analysis, Plaintiff's allegations are more than adequate to plausibly state an underlying violation of Mr. Rutledge's Constitutional rights.

To satisfy the objective component under the traditional deliberate indifference standard, "the test is met if the harm suffered rises to a level 'sufficiently serious' to be cognizable under the Cruel and Unusual Punishment Clause' of the Eighth Amendment." *Martinez v. Beggs,* 563 F.3d 1082, 1088 (10th Cir. 2009). Further, "it is the harm claimed by the prisoner that must be sufficiently serious to satisfy the objective component, and not solely 'the symptoms presented at the time the prison employee had contact with the prisoner.'" *Martinez,* 563 F.3d at 1088 (quoting *Mata v. Saiz,* 427 F.3d 745, 752–53 (10th Cir. 2005)). Death is sufficiently serious to meet the objective component of the deliberate indifference test. *Id.* at 1088–89 (finding that the detainee's heart attack and death was "without a doubt, sufficiently serious to meet the objective component

necessary to implicate the Fourteenth Amendment") (internal quotation marks omitted).  Thus, Plaintiff easily meets the objective component.

The subjective component of the traditional test requires evidence that the official "knows of and disregards an excessive risk to inmate health or safety." *Mata*, 427 F.3d at 751.  A civil rights defendant is deliberately indifferent where he "has knowledge of a substantial risk of serious harm to inmates . . . [and] fails to take reasonable steps to alleviate that risk." *Tafoya v. Salazar*, 516 F.3d 912, 916 (10th Cir. 2008).

"Because it is difficult, if not impossible, to prove another person's actual state of mind, whether an official had knowledge may be inferred from circumstantial evidence." *DeSpain v. Uphoff*, 264 F.3d 965, 975 (10th Cir. 2001).  For instance, "the existence of an obvious risk to health or safety may indicate awareness of the risk." *Rife v. Oklahoma Dep't of Pub. Safety*, 854 F.3d 637, 647 (10th Cir. 2017), *cert. denied sub nom. Dale v. Rife*, No. 17-310, 2017 WL 3731208 (U.S. Oct. 16, 2017), and *cert. denied sub nom. Jefferson v. Rife*, No. 17-314, 2017 WL 3731324 (U.S. Oct. 16, 2017) (citing *Farmer v. Brennan*, 511 U.S. 825, 842 (1994)).  "[I]t does not matter whether the risk comes from a single source or multiple sources, any more than it matters whether a prisoner faces an excessive risk ... for reasons personal to him *or because all prisoners in his situation face such a risk." Farmer*, 511 U.S. at 843.

The Tenth Circuit recognizes two types of conduct constituting deliberate indifference in the corrections medical context. *See Sealock v. Colorado*, 218 F.3d 1205, 1211 (10th Cir. 2000). "First, a ***medical professional may fail to treat a serious medical condition properly***.... The second type of deliberate indifference occurs when ***prison officials prevent an inmate from receiving treatment or deny him access to medical personnel capable of evaluating the need for treatment." Sealock***, 218 F.3d at 1211 (emphasis added). A prison medical professional who serves "solely ... as a gatekeeper for other medical personnel capable of treating

the condition" may be held liable under the deliberate indifference standard if he/she "delays or refuses to fulfill that gatekeeper role." *Id.*

Further, "[a] prisoner may satisfy the subjective component by showing that defendants' ***delay*** in providing medical treatment caused either ***unnecessary pain or a worsening of [his] condition. Even a brief delay may be unconstitutional.***" *Mata*, 427 F.3d at 755 (emphasis added).

Here, applying these legal standards, Plaintiff has alleged facts which tend to show that Turn Key personnel were deliberately indifferent to Mr. Rutledge's serious medical/mental health needs, under the traditional standard. *See* Summary of Allegations Concerning Mr. Rutledge, *supra.* Reading the Complaint in a light most favorable to Plaintiff, as this Court must, she has plausibly alleged that Turn Key personnel failed to provide any medical or mental health treatment to Mr. Rutledge, who was in an obviously emergent mental health situation, in deliberate indifference to his serious medical/mental health needs.

In its Motion to Dismiss, Turn Key incorrectly asserts that "[a]nother fatal flaw of the Complaint is Plaintiff's failure to identify any Turn Key employee other than in the most general terms by lumping Turn Key staff and TCSO staff together as collectively failing to provide care." Dkt. #12 at p. 22/27. However, Plaintiff specifically alleged that "medical staff employed by Turn Key failed to provide mental health care and supervision – including suicide watch precautions – for Ty Rutledge in spite of the obvious and substantial risk that Rutledge posed to himself." Dkt. #2 at ¶ 18. Further, it is not necessary to identify specific Turn Key personnel, especially at the pleading stage, in cases such as this one where Plaintiff is alleging longstanding systemic failures in the Jail medical system as a whole and Turn Key's operations as a corrections medical provider at the corporate level. *See, e.g., Garcia v. Salt Lake County*, 768 F.3d 303, 310 (10th Cir. 1985): ("Although the acts or omissions of no one employee may violate an individual's constitutional rights, the

combined acts or omissions of several employees acting under a governmental policy or custom may violate an individual's rights.").

### B. Plaintiff's Complaint States Plausible § 1983 Claims Against Turn Key Under a Municipal/*Monell* Liability Theory

In alleging that Mr. Rutledge's damages resulted from official policies or customs carried out by Turn Key, Plaintiff has sufficiently pled her § 1983 claims against Turn Key under a municipal liability theory.   In *Monell v. New York City Dept. of Social Servs.*, 436 U.S. 658 (1977) and subsequent cases, the Supreme Court has consistently "required a plaintiff seeking to impose liability on a municipality under § 1983 to identify a municipal 'policy' or 'custom' that caused the plaintiff's injury." *Bd. of Cnty. Comm'rs of Bryan Cnty., Okl. v. Brown*, 520 U.S. 397, 403 (1997).

A municipal policy or custom may take the form of:

> (1) a formal regulation or policy statement; (2) an informal custom amounting to a widespread practice that, although not authorized by written law or express municipal policy, is so permanent and well settled as to constitute a custom or usage with the force of law; (3) the decisions of employees with final policymaking authority; (4) the ratification by such final policymakers of the decisions—and the basis for them—of subordinates to whom authority was delegated subject to these policymakers' review and approval; or (5) the failure to adequately train or supervise employees, so long as that failure results from deliberate indifference to the injuries that may be caused.

*Bryson v. City of Oklahoma City*, 627 F.3d 784, 788 (10th Cir. 2010) (internal quotation marks omitted).

It is well-established that "when private individuals or groups" like Turn Key "are endowed by the State with powers or functions governmental in nature, they become agencies or instrumentalities of the State and subject to its constitutional limitations." *Evans v. Newton*, 382 U.S. 296, 299 (1966).   As the Tenth Circuit has reasoned, where a corporate defendant acts "for the government in carrying out a government program in accordance with government regulations, [the corporate defendant is] a person 'acting under color of state law.'" *Dubbs v. Head Start, Inc.*, 336 F.3d 1194, 1216, n. 13 (10th Cir. 2003). The United States Supreme Court has specifically held

18

that a private physician treating prisoners under a contract with state prison authorities acted under color of state law for purposes of the Eighth Amendment. *West v. Atkins,* 487 U.S. 42, 57 (1988); *see also Ancata v. Prison Health Services,* 769 F.2d 700 (11th Cir. 1985) (medical services corporation acting on behalf of a county is a "person" for the purposes of § 1983).

Further, "[a]lthough the Supreme Court's interpretation of § 1983 in *Monell* applied to municipal governments and not to private entities acting under color of state law, case law from [the Tenth Circuit] and other circuits *has extended the Monell doctrine to <u>private</u> § 1983 defendants." Dubbs,* 336 F.3d 1216 (citations omitted) (emphasis added).

Governmental entities may be held liable for the maintenance of an unconstitutional health care delivery system. In *Burke v. Regalado,* 935 F.3d 960, 999-1001 (10th Cir. 2019), the Tenth Circuit upheld a jury verdict against the Tulsa County Sheriff for his failure to supervise based on evidence that he maintained a policy or custom of insufficient medical resources and training, chronic delays in care and indifference toward inmate medical needs at the Tulsa County Jail. *See also Burke v. Glanz,* No. 11-CV-720-JED-PJC, 2016 WL 3951364, at *23 (N.D. Okla. July 20, 2016) ("[B]ased on the record evidence construed in plaintiff's favor, a reasonable jury could find that, in the years prior to Mr. Williams's death in 2011, then-Sheriff Glanz was responsible for knowingly continuing the operation of a ***policy or established practice of providing constitutionally deficient medical care*** in deliberate indifference to the serious medical needs of Jail inmates like Mr. Williams."). As summarized herein, Plaintiff has adequately alleged that Turn Key maintained such a system, and that this system is causally related to the underlying violation(s) of Mr. Rutledge's Constitutional rights. *See* "Summary of Allegations," *supra,* at pp. 3-5.

Most pertinent to Mr. Rutledge, Plaintiff has alleged, *inter alia*:

- ■ Turn Key has no protocol or clear policy with respect to the medical monitoring and care of inmates with complex or serious medical needs, and provides no guidance to its medical staff regarding the appropriate standards of care with

respect to inmates with complex or serious mental health needs, including suicidal inmates.

- Specifically, Turn Key has an established practice of failing to adequately assess and treat -- and ignoring and disregarding -- obvious or known symptoms of emergent and life-threatening conditions.

- These failures stem from the chronic unavailability of an on-site physician, financial incentives to avoid the costs of inmate prescription medications and off-site treatment and a failure to train and supervise medical staff in the assessment and care of inmates with complex or serious mental health needs, including suicidal inmates.

- Turn Key's inadequate or non-existent policies and customs were a moving force behind the constitutional violations and injuries alleged herein.

Dkt. #2 at ¶¶ 49-56.

Turn Key's failure to implement a clear policy with respect to the medical monitoring and care of inmates with complex or serious medical needs and failure to provide guidance to its medical staff regarding the appropriate standards of care with respect to inmates with complex or serious mental health needs, including suicidal inmates, was a driving force behind Mr. Rutledge's death. Pursuant to these practices, Turn Key staff failed to *inter alia*: refer Mr. Rutledge for a mental health assessment, frequently visually monitor Mr. Rutledge; place Mr. Rutledge on suicide watch precautions, remove bed linens and garments from Mr. Rutledge's cell; monitor Mr. Rutledge through use of the intercom system; call medical personnel to provide treatment to Mr. Rutledge, despite the fact that Mr. Rutledge was obviously depressed and suicidal. *See* Dkt. #2 at ¶ 23. Similarly, Turn Key's established practice of failing to adequately assess and treat -- and ignoring and disregarding -- obvious or known symptoms of emergent and life-threatening conditions was a driving force behind Mr. Rutledge's death, as Turn Key personnel failed to provide any treatment for Mr. Rutledge despite his obviously emergent mental health condition. Finally, Turn Key's established practice of failing to provide an on-site physician and failing to train and supervise medical staff in the assessment and care of inmates with complex or serious mental health

needs, including suicidal inmates was a driving force behind Mr. Rutledge's death. Pursuant to that practice, Turn Key personnel failed to refer Mr. Rutledge to either a trained psychiatrist or an off-site medical provider who could adequately assess, monitor, and treat his obviously emergent condition.

Further, Plaintiff has provided examples of other situations in which Turn Key personnel, consistent with their established practices/customs, failed to monitor suicidal inmates and failed to treat inmates who were obviously seriously physically and/or mentally ill. *See, e.g.*, Dkt. #2 at ¶¶ 58-71. Similar to *Estate of Blodgett v. Correct Care Solutions, LLC,* 2018 WL 6528109, *5 (D.Colo.2018), "[i]n essence, Plaintiff contends that [Turn Key] has such a widespread practice of inadequate medical and mental care at detention facilities, that 'providing inadequate medical care' is, in fact, a custom of the company." The *Blodgett* Court, in denying Defendant Correct Care Solutions, LLC's ("CHC") motion to dismiss, noted that "[w]hile Plaintiff's allegations are limited, at this stage, they are sufficient to survive a motion to dismiss." *Id.* The *Blodgett* Court continued by stating that "Plaintiff has alleged facts to plausibly support a claim that CHC has a widespread practice of tolerating substandard or delayed medical care which is, in effect, a problem of failure to train or supervise employees on the provision of adequate medical care."

Lastly, though Turn Key does not directly address the issue, Plaintiff has sufficiently alleged "deliberate indifference" at the municipal, or in this case, corporate, level. "Deliberate indifference … is defined differently for Eighth Amendment and municipal liability purposes." *Barney v. Pulsipher,* 143 F.3d 1299, 1308, n. 5 (10th Cir. 1998). "In the municipal liability context, deliberate indifference is an ***objective* standard which is satisfied if the risk is so obvious that the official *should* have known of it.**" *Barney,* 143 F.3d at 1308, n. 5 (citing *Farmer v. Brennan,* 511 U.S. 825, 840–42 (1994)) (emphasis added).  Here, Turn Key must have or should have known of the significant risks to inmate health based on: (A) the incidents at other Turn Key facilities, (B) the

obvious problems with staffing the entire medical system with one physician; (C) the policy of providing non-existent supervision of the nursing staff's clinical care (even with inmates having life-threatening conditions); (D) the practice of encouraging staff not to use off-site providers; (E) the other suicides at the Tulsa County Jail during the time Turn Key was its medical provider; (F) the established practice of failing to adequately assess and treat -- and ignoring and disregarding -- obvious or known symptoms of emergent and life-threatening conditions; and (G) Turn Key's failure to train its medical staff regarding the appropriate standards of care with respect to inmates with complex or serious mental health needs, including suicidal inmates.

In sum, as stated in the Complaint, Plaintiff's allegations of a policy or custom, causation and "deliberate indifference" are well-supported, robust and clearly assert a plausible § 1983 claim against Turn Key under *Monell* and its progeny.

### B.  PROPOSITION: PLAINTIFF FILED HER COMPLAINT WITHIN THE APPLICABLE STATUTE OF LIMITATIONS

Defendant Turn Key argues, in its Motion to Dismiss, that Plaintiff's Complaint should be dismissed because her claims are barred by the statute of limitations. *See* Dkt. #12, pp. 7-8. Defendant's argument is premised on the fact that (1) Plaintiff's claims accrued on May 19, 2018, (2) Plaintiff's claims are subject to a two (2) year statute of limitations, (3) Plaintiff's Complaint was filed on July 20, 2020, more than two (2) years after the accrual date of Plaintiff's claims, and (4) there is no reason to toll the statute of limitations in this case. *Id*.  The fatal flaw in Defendant's argument is that, due to recent Emergency Orders issued by the Oklahoma Supreme Court as a result of the ongoing COVID-19 pandemic, the statute of limitations applicable to Plaintiff's claims was tolled for a period of 61 days. As a result, Plaintiff's Complaint was timely filed, and Defendant's argument is without merit.

"In a § 1983 action, state law governs issues regarding the statute of limitations and tolling, although federal law governs the determination of when a § 1983 action accrues. *Braxton v. Zavaras*, 614 F.3d 1156, 1159 (10th Cir. 2010) (*citing Fratus v. DeLand*, 49 F.3d 673, 675 (10th Cir.1995). The statute of limitations period for a § 1983 claim is dictated by the personal injury statute of limitations in the state in which the claim arose[.]" *McCarty v. Gilchrist*, 646 F.3d 1281, 1289 (C.A.10 (Okla.) 2011) (*citing Wallace v. Kato*, 549 U.S. 384, 387, 127 S.Ct. 1091, 166 L.Ed.2d 973 (2007)). "In Oklahoma, the appropriate statute of limitations period for § 1983 claims is the two-year limitation of 12 O.S. § 95(A)(3), which addresses not only personal injury actions, but actions grounded in trespass, conversion, or fraud." *Buckland v. Buckland*, 2011 WL 4809992, at *2 (E.D. Okla. 2011).

On March 16, 2020, The Supreme Court of Oklahoma and Oklahoma Court of Criminal Appeals issued SCAD NO. 2020-24, First Emergency Joint Order Regarding The COVID-19 State of Disaster ("First Emergency COVID-19 Order"). *See* First Emergency COVID-19 Order (Ex. 1). The First Emergency COVID-19 Order was "issued to clarify the procedures to be followed in all Oklahoma district courts and to encourage social distancing and to avoid risks to judges, court clerks, court employees and the public." First Emergency COVID-19 Order (Ex. 1), at ¶ 1. Pursuant to the First Emergency COVID-19 Order, "[i]n any civil case, the statute of limitations shall be extended for 30 days from the date of this order." First Emergency COVID-19 Order (Ex. 1), at ¶ 4.

On March 27, 2020, The Supreme Court of Oklahoma and Oklahoma Court of Criminal Appeals issued SCAD NO. 2020-29, Second Emergency Joint Order Regarding The COVID-19 State of Disaster ("Second Emergency COVID-19 Order"). *See* Second Emergency COVID-19 Order (Ex. 2). Pursuant to the Second Emergency COVID-19 Order, the First Emergency COVID-19 Order "remains in effect except as it is modified herein[;]" and "[i]n any civil case, the

statute of limitations shall be extended through May 15, 2020." Second Emergency COVID-19 Order (Ex. 2), ¶¶ 1, 5.

On April 29, 2020, The Supreme Court of Oklahoma and Oklahoma Court of Criminal Appeals issued SCAD NO. 2020-36, Third Emergency Joint Order Regarding The COVID-19 State of Disaster ("Third Emergency COVID-19 Order").  *See* Third Emergency COVID-19 Order (Ex. 3).  The Third Emergency COVID-19 Order "modifies the First and Second Joint Emergency Orders (SCAD Nos. 2020-24 & 2020-29) from the Oklahoma Supreme Court and the Court of Criminal Appeals."  Third Emergency COVID-19 Order (Ex. 3), ¶ 1.  Pursuant to the Third Emergency COVID-19 Order:

> Paragraphs 4 and 5 of the Second Emergency Joint Order remain in effect to May 15, 2020.  In all cases, the period from **March 16, 2020 to May 15, 2020**, during which all rules and procedures, and deadlines, whether prescribed by statute, rule or order in any civil, juvenile or criminal cases were suspended, will be treated as a tolling period.  May 16th shall be the first day counted in determining the remaining time to act.  The entire time permitted by statute, rule or procedure is not renewed.

Third Emergency COVID-19 Order (Ex. 3), ¶ 5.  Pursuant to the Emergency COVID-19 Orders, the two (2) year statute of limitations applicable to Plaintiff's claims was tolled from March 16, 2020 to, and including, May 15, 2020; a total of sixty-one (61) days.

As alleged in Plaintiff's Complaint (Dkt. #2), Mr. Rutledge died on May 19, 2018. *See* Dkt. #2 at ¶ 17.  Thus, the general two (2) year statute of limitations on Plaintiff's claims on behalf of Mr. Rutledge's estate ended on May 19, 2020.  Due to the Third Emergency COVID-19 Order, the applicable statute of limitations was tolled for a period of sixty-one (61) days, or until Monday, July 20, 2020.[4]  As such, Plaintiff timely filed her Complaint on Monday, July 20, 2020 and Defendant's Motion should be denied.

---

[4] Sixty-one (61) days after March 19, 2020 was Sunday, July 19, 2020.  In accordance with Rule 6(a)(1)(C), the deadline for Plaintiff to file her complaint was the following Monday, July 20, 2020. *See Merriweather v. City of Memphis*, 107 F.3d 396, 398 (6th Cir. 1997) ("Rule 6(a) does govern

Further, even if The Oklahoma Supreme Court had not tolled the statute of limitations applicable to Plaintiff's claims, the statute of limitations should be tolled pursuant to the federal principle of equitable tolling. "[I]n the appropriate case, exceptional circumstances may justify tolling a statute of limitations." *United States v. Clymore,* 245 F.3d 1195, 1199 (10th Cir.2001). "Generally, a litigant seeking equitable tolling bears the burden of establishing two elements: (1) that he has been pursuing his rights diligently, and (2) that some extraordinary circumstance stood in his way." *Pace v. DiGuglielmo*, 544 U.S. 408, 418, 125 S. Ct. 1807, 1814, 161 L. Ed. 2d 669 (2005). "[T]he 'extraordinary circumstances' aspect of equitable tolling is based on the reasoning 'that it is unfair to penalize the plaintiff for circumstances outside his or her control, so long as the plaintiff makes good faith efforts to pursue the claims when possible.'" *Braxton v. Zavaras*, 614 F.3d 1156, 1161–62 (10th Cir. 2010) (*quoting Dean Witter Reynolds, Inc. v. Hartman*, 911 P.2d 1094, 1097 (Colo.1996)). Plaintiff contends that the ongoing COVID-19 emergency is an exceptional circumstance sufficient to toll the statutes of limitations applicable to Plaintiff's claims.  Indeed, courts in other districts have found the same. *See Maury v. Davis*, No. 2:12-CV-1043 WBS DB, 2020 WL 3065934, at *2 (E.D. Cal. Apr. 21, 2020), *report and recommendation adopted*, No. 212CV1043WBSDBP, 2020 WL 3057818 (E.D. Cal. June 9, 2020) ("The emergence of the COVID-19 pandemic and the resulting restrictions on social interactions and travel certainly qualify as an extraordinary circumstance." ); *See also, Cowan v. Davis*, No. 1:19-cv-00745-DAD, 2020 WL 1503423 (E.D. Cal. Mar. 30, 2020) (granting motion for equitable tolling of the habeas statute of limitations based on COVID-19).

---

the computation of the limitations period."); *See also, Allgood v. Elyria United Methodist Home,* 904 F.2d 373, 376 (6th Cir.1990) (noting that Rule 6(a) applies to borrowed state statutes of limitations).

As shown above, due to the tolling of the two (2) year statute of limitation in this case, Plaintiff's complaint was timely filed, her claims are not time-barred, and, as such, should not dismissed.

WHEREFORE, premises considered, Plaintiff respectfully requests that the Court deny Defendant Turn Key Health Clinics, LLC's Motion to Dismiss (Dkt. #12).

Respectfully submitted,

/s/ Robert Blakemore
Daniel E. Smolen, OBA#19943
Robert Blakemore, OBA #18656
SMOLEN & ROYTMAN
701 S. Cincinnati Ave.
Tulsa, Oklahoma 74119
P: (918) 585-2667
F: (918) 585-2669

***Attorneys for Plaintiffs***

## CERTIFICATE OF SERVICE

I hereby certify that on this 18th day of September 2020, I electronically transmitted the foregoing document to the Clerk of Court using the ECF System for filing and the transmittal of a Notice of Electronic Filing to all counsel who have entered an appearance in this action.

/s/Robert Blakemore